FRANCIS JUNGERS SOLE PROPRIETORSHIP, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16401–80R.    Filed March 3, 1982.

*Carroll J. Savage* and *H. Craig Kinney*, for the petitioner.
*Larry N. Johnson*, for the respondent.

OPINION

SIMPSON, *Judge*: The petitioner has instituted this action pursuant to section 7476(a)(1) of the Internal Revenue Code of 1954[1] for a declaratory judgment that the Francis Jungers Sole Proprietorship Profit Sharing Plan is a qualified plan under section 401(a). Mr. Jungers rolled over his lump-sum distribution from a qualified plan to an H.R. 10 plan subject to an agreement to repay a portion of such distribution to the transferor plan in the event of its early termination. The sole issue for decision is whether such agreement is an impermissible assignment or alienation of benefits within the meaning of section 401(a)(13) so as to disqualify the H.R. 10 plan.

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during 1978, unless otherwise indicated.

Pursuant to Rule 217(b), Tax Court Rules of Practice and Procedure,[2] the parties filed with the Court the administrative record relating to the request for a determination that the petitioner's profit-sharing plan is a qualified plan and to the revocation of such determination. The case was submitted fully stipulated pursuant to Rule 122.

The petitioner, Francis Jungers Sole Proprietorship, is a sole proprietorship engaged in the business of providing consulting services, director services, and other advisory and management services to various businesses. Francis Jungers is the owner and only person working in such business. At the time it filed its petition in this case, the petitioner's principal office was in Sunriver, Oreg.

Effective April 1, 1978, Mr. Jungers retired from the Arabian American Oil Co. (Aramco). As an employee of Aramco, he was a participant in its retirement income plan (the income plan). Such plan was funded by a group annuity contract with Aetna Life Insurance Co. (Aetna). Upon his retirement from Aramco, Mr. Jungers was entitled to receive a lump-sum distribution of the balance to his credit under the income plan. However, since he was 1 of the 25 highest paid employee-participants in the income plan, and since such plan had been amended to increase substantially the employee benefits within the 10 years preceding his retirement, the distribution to him was subject to the early termination rules of section 1.401–4(c), Income Tax Regs. Under such rules, a qualified plan must include limitations on employer contributions which may be used for the benefit of any of the 25 highest paid employee-participants if the plan is terminated within 10 years after its establishment, if the benefits of 1 of such employees become payable within 10 years after the establishment of the plan, or if the benefits of such an employee become payable after the plan has been in effect for 10 years but the full current costs of the plan for the first 10 years have not been funded. Sec. 1.401–4(c)(2)(ii), Income Tax Regs. In addition, if a plan has been changed so as to increase substantially the extent of possible discrimination as to contributions and as to the benefits actually payable in the event of the subsequent

---

[2]All references to a Rule are to the Tax Court Rules of Practice and Procedure.

termination of the plan or the subsequent discontinuance of contributions thereunder, the early termination rules apply to the plan, as changed, as if it were a new plan on the date of such change. Sec. 1.401–4(c)(5), Income Tax Regs.

Because of the applicability of the early termination rules, Aetna, as a condition to making the distribution to Mr. Jungers, required him to execute an escrow agreement which provided that if the income plan terminated prior to October 1, 1984, or if a default occurred in the payment of the full current costs of the plan before such date, he would repay to the income plan the restricted portion of his lump-sum distribution. The restricted portion of such distribution was the amount which, under the early termination rules, he would be required to repay to the income plan in the event of an early termination of such plan. See sec. 1.401–4(c)(2)(iii) and (c)(5), Income Tax Regs. The escrow agreement also required that Mr. Jungers secure his contingent obligation to repay the restricted portion by depositing with an acceptable depositary property having a fair market value of 125 percent of such portion; such agreement further provided that, if at any time thereafter the fair market value of the property held by the depositary fell below 110 percent of such portion, Mr. Jungers was required to deposit additional property in order to secure his contingent obligation to the income plan. The escrow agreement permitted any property deposited with a depositary to be held by a subtrustee of an H.R. 10 plan to be established by Mr. Jungers.

Effective as of January 1, 1978, Mr. Jungers established the Francis Jungers Sole Proprietorship Profit Sharing Plan (the H.R. 10 plan) into which he rolled over his entire distribution from the income plan,[3] including the restricted portion of such distribution. The H.R. 10 plan is funded by a trust, the Francis Jungers Sole Proprietorship Profit Sharing Trust (the trust), and a subtrust, the Francis Jungers Sole Proprietorship Profit Sharing Subtrust (the subtrust). The subtrust was created purely for administrative convenience and is not essential to the petitioner's arrangement. Pursuant to the escrow agreement, 125 percent of the restricted portion of Mr. Jungers'

---

[3] See sec. 402(a)(5).

lump-sum distribution was deposited in such subtrust to secure his obligation to repay the restricted portion of such distribution.

Section 3.2 of the H.R. 10 plan provides that a participant in such plan may (subject to certain restrictions) contribute to such plan any property previously received by him as a lump-sum distribution. Section 3.3 of such plan provides that if a participant rolls over a lump-sum distribution from a qualified plan (the former plan) and if such distribution is subject to the early termination rules of section 1.401–4(c), Income Tax Regs., so that the participant is subject to an obligation to repay the restricted portion of such distribution, "the Participant may designate such portion of the rollover necessary to adequately secure such obligation to be deposited in his Security Account." Such security account is to be held as a separate subtrust. The rollover distribution is held in a rollover account, except to the extent that it is held in the security account.

Section 3.4 of the H.R. 10 plan requires the trustee of such plan to pay to the trustee of the former plan such portion of the participant's security account as is necessary to extinguish the participant's obligation to the trustee of the former plan. Such section also provides that only upon certification of the trustee of the former plan that the participant is no longer obligated to repay the restricted portion of the distribution will the trustee of the H.R. 10 plan be allowed to transfer funds from the participant's security account to his rollover account and that no other payments of distributions are permitted to be made from the security account.

Section 3.5 of the H.R. 10 plan provides that if at any time the market value of the property in the participant's security account declines in value and becomes insufficient to secure the participant's obligation to repay the restricted portion of his distribution to the trustee of the former plan, the participant may designate that property be transferred from his rollover account to his security account in an amount sufficient to insure adequate security for such obligation. Under the terms of the subtrust, the subtrustee or the profit sharing committee of the H.R. 10 plan has authority over investments and reinvestments of property placed in the subtrust.

Section 12.1 of the H.R. 10 plan provides that "No benefit

under the Plan shall in any manner or to any extent be assigned, alienated, or transferred by any Participant or beneficiary under the Plan. However, the above restriction shall in no way limit the application of Sections 3.3 and 3.4 herein."

In March 1978, the petitioner requested a determination with respect to the qualification of the H.R. 10 plan. On August 4, 1978, the Commissioner issued a determination in which he concluded that the H.R. 10 plan was a qualified plan within the meaning of section 401(a). Subsequently, the Seattle District Office of the IRS requested technical advice from the National Office of the IRS as to whether the H.R. 10 plan satisfied the requirements of section 401(a)(13). On March 14, 1980, the National Office responded to such request, concluding that the arrangement under the H.R. 10 plan for securing Mr. Jungers' obligation to repay the restricted portion of the lump-sum distribution constituted an assignment or alienation of benefits prohibited by section 401(a)(13). Based on such technical advice, the Seattle District Director issued, on June 17, 1980, a final revocation in which he revoked the favorable determination of August 4, 1978, and concluded that the H.R. 10 plan did not meet the requirements of section 401 for the taxable year ending December 31, 1978.

Section 401(a)(13) states, in part, that for a trust to qualify under section 401(a), the plan must provide "that benefits provided under the plan may not be *assigned or alienated*"[4] (emphasis added). Section 1.401(a)–13(c)(1), Income Tax Regs., defines the terms "assignment" and "alienation" as including:

(i) Any arrangement providing for the payment to the employer of plan benefits which otherwise would be due the participant under the plan, and

(ii) Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party *acquires from a participant* or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary. [Emphasis added.]

However, section 1.401(a)–13(c)(2) provides that the terms "assignment" and "alienation" do not include the following arrangements:

---

[4]Sec. 401(a)(13) was added to the Code by sec. 1021(c) of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 937.

(iii) Any arrangement for the recovery by the plan of overpayments of benefits previously made to a participant,

(iv) Any arrangement for the transfer of benefit rights from the plan to another plan, * * *

In support of its position, the petitioner maintains that Mr. Jungers had only a restricted right to the lump-sum distribution from the income plan and that when he rolled over such distribution to the H.R. 10 plan, it was subject to such restriction. Thus, he claims that he never assigned any interest in the H.R. 10 plan to the income plan and that the income plan never acquired from him any interest in the H.R. 10 plan. In the alternative, the petitioner maintains that the arrangement for repaying the restricted portion of the lump-sum distribution to the income plan comes within the exceptions described in section 1.401(a)–13(c)(2)(iii) and (iv) of the regulations. We agree with the petitioner's positions.

The record does not reveal the amounts of Mr. Jungers' total distribution or the restricted portion thereof, but, for purposes of this discussion, let us assume that his total distribution was $800,000 and that the restricted portion was $500,000. Under the income plan, he had a right to receive $800,000, but his right to such funds was not free and unrestricted. Because of the amendment of such plan and the increase in the benefits thereunder, there existed the possibility of a prohibited discrimination in favor of Mr. Jungers if he were paid the entire $800,000 and if the plan were terminated before 1984. To allow him to receive his distribution and to avoid the possibility of such discrimination, it was necessary for him to agree to the restriction on a portion of such distribution. To carry out its obligation under the plan, Aetna insisted on Mr. Jungers' establishing the depositary arrangement, and the provisions of the subtrust were identical to those approved by the Commissioner in Rev. Rul. 61–10, 1961–1 C.B. 143.[5] Mr. Jungers transferred to the H.R. 10 plan his entire interest in the distribution which he received from the income plan.

Congress sought to facilitate the portability of an employee's interest in a retirement plan by authorizing the rollover of such interest from one plan to another. Sec. 402(a)(5); see H.

---

[5] Rev. Rul. 61–10 has been restated under the current law and superseded by Rev. Rul. 81–135, 1981–1 C.B. 203.

Rept. 93–807 (1974), 1974–3 C.B. (Supp.) 236, 264–265; S. Rept. 93–383 (1973), 1974–3 C.B. (Supp.) 80, 85–86, 109–110, 150–157; S. Rept. 93–127 (1973), 1974–3 C.B.(Supp.)1, 10–11. At the time Mr. Jungers made the arrangements for rolling over his distribution from the income plan, section 402(a)(5) required that the entire distribution be rolled over in order to avoid taxation of the distribution.[6] Thus, if he had not transferred the $500,000 restricted portion of his distribution to the H.R. 10 plan, there would have been a question as to whether he was taxable on the distribution or any portion thereof. In any event, if he had not included such $500,000 in the funds transferred to the H.R. 10 plan, he could not have transferred such funds to such plan later when the early termination rules were no longer applicable to it. See sec. 402(a)(5)(C). If Mr. Jungers had withheld from the rolled-over funds the entire amount required to satisfy his obligation to the income plan, it would have been necessary for him to withhold a total of $625,000—$500,000 restricted portion, plus 25 percent thereof as additional security. Consequently, with respect to such $625,000, he would neither be entitled to the special tax benefits applicable to funds held by a qualified retirement plan,[7] nor would such funds necessarily have been available for retirement purposes and subject to the protection afforded by section 401(a)(13). See H. Rept. 93–807, *supra*, 1974–3 C.B. (Supp.) at 303. On the other hand, if he had transferred the entire $800,000 to the H.R. 10 plan and placed $625,000 of outside funds in a depositary, and if he had been required to repay all or a part of the restricted portion to the income plan as a result of its early termination, he would receive favorable tax treatment for the entire $800,000 in the H.R. 10 plan even though such amount exceeds the distribution to which he was

---

[6]Sec. 402(a)(5)(A)(ii) provides that an employee may roll over less than his entire lump-sum distribution, and sec. 402(a)(5)(C) provides that the rollover must occur within 60 days after the employee receives the lump-sum distribution. However, at the time Mr. Jungers made the arrangements for rolling over his distribution from the income plan, a partial rollover did not qualify for lump-sum distribution treatment. See sec. 2002(g)(5), Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 968 (which added sec. 402(a)(5)(B)(ii)); see also sec. 4(a) and (d)(2), Act of Oct. 14, 1978, Pub. L. 95–458, 92 Stat. 1258, 1260.

[7]Such favorable treatment includes the tax-free accumulation of earnings (see sec. 501(a)), 10-year forward averaging if benefits in the H.R. 10 plan are distributed in a lump sum (see sec. 402(e)), and favorable estate tax treatment (see sec. 2039(c) and (f)).

ultimately entitled under the income plan. Under such circumstances, there would be a question of whether Mr. Jungers made an impermissible contribution to the H.R. 10 plan to the extent of the repayment. See sec. 402(a)(5)(B).

The purpose for enacting section 401(a)(13) was "To further ensure that the employee's accrued benefits are actually available for retirement purposes." H. Rept. 93–807, *supra*, 1974–3 C.B. (Supp.) at 303; H. Rept. 93–779 (1974), 1974–3 C.B. 244, 309; see also *Operating Engineers, etc. v. Zamborsky*, 650 F.2d 196, 201 (9th Cir. 1981); *American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118, 124 (2d Cir. 1979) ("The purpose of the proscription on alienation and assignment is to protect an employee from his own financial improvidence in dealings with third parties."); *Senco of Florida, Inc. v. Clark*, 473 F. Supp. 902, 908 (M.D. Fla. 1979) ("the intent of Congress in enacting ERISA was to protect the employees and their families from bargaining away the benefits provided by employee benefit plans qualified under ERISA."). Such purpose was clearly not frustrated by the arrangement made by Mr. Jungers. The funds that he received from the income plan were subject to a restriction, and the provisions of the H.R. 10 plan merely gave effect to that restriction. By including such provisions in the H.R. 10 plan, Mr. Jungers was not attempting to assign or alienate any retirement benefits to which he was entitled under that plan—he was recognizing the limitation which the law places on the benefits that he had tentatively received under the income plan. The income plan had a "string" on the distribution to Mr. Jungers, and the provisions of the H.R. 10 plan recognized the existence of that "string." In summary, the arrangement made by Mr. Jungers for the transfer of his distribution to the H.R. 10 plan carried out the legislative objectives of encouraging the portability of plan benefits and ensuring that the maximum amount of accrued benefits under a qualified plan is available for retirement purposes, and it resulted in his continuing to receive favorable tax treatment only with respect to the appropriate amount of such distribution.

The Commissioner rejected the arrangement by Mr. Jungers on the ground that the restriction did not attach to property transferred to the H.R. 10 plan. Since it was money that was transferred to such plan, there was no property that carried a

restriction on its title, and the income plan did not have a right to recover any particular property in the event of early termination of such plan. Nevertheless, in our judgment, such considerations are wholly irrelevant. We are concerned with whether the provisions of the H.R. 10 plan authorized a proscribed assignment of the participant's interest in the plan, and to answer that question, we must examine the statutory requirement in the light of its legislative history. The early termination rules were adopted long before the enactment of section 401(a)(13) (see Mim. 5717, 1944 C.B. 321, 322), and by the issuance of Rev. Rul. 61–10, *supra*, the Commissioner approved of arrangements like the one adopted by Mr. Jungers. There is absolutely no indication that by the enactment of section 401(a)(13) Congress intended to nullify or reject such arrangements or to require that the title to property included in a lump-sum distribution be restricted in order to comply with the requirement of section 401(a)(13). Hence, we conclude that the provisions of the H.R. 10 plan adopted by the petitioner do not contravene section 401(a)(13).

We also agree with the petitioner that the arrangement to secure Mr. Jungers' contingent obligation to repay the restricted portion of the lump-sum distribution comes within the express exceptions of section 1.401(a)–13(c)(2)(iii) and (iv), Income Tax Regs. Subdivision (iii) thereof provides an exception for "*Any arrangement* for the recovery by the plan of overpayments of benefits previously made to a participant" (emphasis added). The Commissioner argues that since the distribution to Mr. Jungers consisted of the balance to his credit in the income plan, no portion of such distribution, including the restricted portion thereof, can be construed as an overpayment to him within the meaning of such regulation. Yet, if there is an early termination of the income plan, the distribution to Mr. Jungers exceeds the amount to which he was entitled under the nondiscrimination provisions of section 401(a)(4) and section 1.401–4(c) of the regulations, and as a result, there will have been an overpayment to him which the income plan has a right to recover.

As we have already mentioned, the early termination rules and the arrangements for recovering overpayments when such rules are applicable were in existence before the enactment of section 401(a)(13) and before the adoption of the regulations

thereunder. We have no indication as to the types of overpayments which were in the minds of the draftsmen of the regulations; yet, we have no reason to believe that overpayments resulting from the applicability of the early termination rules were not intended to be covered by such regulations. In fact, it is very likely that the regulations were intended to apply to a provision in a plan paying benefits which may be recovered as a result of the early termination rules, and when the distribution from such a plan is rolled over to another plan, it is a necessary corollary to include in the transferee plan a provision authorizing payment of the overpayment. The language of the regulations certainly is broad enough to cover the arrangement made by Mr. Jungers, and to so interpret the regulations is entirely consistent with the legislative purpose of section 401(a)(13).

Section 1.401(a)–13(c)(2)(iv), Income Tax Regs., provides an exception for "*Any arrangement* for the transfer of benefit rights from the plan to another plan" (emphasis added). The Commissioner argues that such exception is inapplicable because Mr. Jungers' arrangement was not a transfer of benefits under the H.R. 10 plan to the income plan. In our opinion, the Commissioner's view of the exception is too narrow.

The regulations reflect the parenthetical language of H. Rept. 93–807, *supra*, 1974–3 C.B. (Supp.) at 303, and H. Rept. 93–779, *supra*, 1974–3 C.B. at 309, that "(Of course, this provision is not intended to prevent the transfer of benefit rights from one qualified plan to another.)." Such language clearly contemplated that a plan was not to be disqualified because it contained a provision authorizing a participant to transfer his benefits to another qualified plan. When a transfer of such benefits is subject to the early termination rules of section 1.401–4(c), Income Tax Regs., it is essential to include in the transferee plan a provision for the recapture of some of such benefits in the event of an early termination of the transferor plan. A literal reading of the exception in subdivision (iv) of the regulations might hold that, in such a situation, there is no transfer of benefits from the transferee plan; yet, if the early termination rules become applicable, there will be a transfer of funds from the transferee plan, and the transfer of such funds will result in a reduction in the

benefits ultimately received from the transferee plan. Furthermore, unless the transferee plan authorizes the recapture, there can be no transfer of benefits from the transferor plan. Thus, the inclusion of the recapture provision facilitates the transfer of benefits from one qualified plan to another and carries out the legislative objective of encouraging the portability of retirement benefits. See H. Rept. 93–807, *supra*, 1974–3 C.B. (Supp.) at 264–265.

The Commissioner further argues that the security arrangement was only necessary because Mr. Jungers desired to take his accrued benefits in the form of a lump-sum distribution and because he was one of the 25 highest paid employee-participants. However, we find nothing in the statute or legislative history which would support our holding that, under such circumstances, Congress intended to discriminate against such individuals in their use of rollovers. Accordingly, we hold that the provisions of the H.R. 10 plan authorizing a repayment to the income plan in the event of an early termination of the latter plan do not constitute an impermissible assignment or alienation of plan benefits within the meaning of section 401(a)(13) and that the H.R. 10 plan is a qualified plan within the meaning of section 401(a).

*An appropriate decision will be entered.*

